# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TINA BARNETT,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **LOWES HOME CENTERS, LLC,** | **NO. 18-2064** |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiff Tina Barnett brings this suit against her former employer, Defendant Lowes Home Centers, LLC, alleging that Lowes violated a number of federal laws when it terminated her employment. Plaintiff's claims are brought pursuant to: (1) Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; (2) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et. seq.* ("Title VII"); (3) the Americans' with Disabilities Act, 42 U.S.C. §§ 12101 *et. seq.* ("ADA"); and, (4) the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et. seq.* ("FMLA"). Before the Court is Defendant's motion for summary judgment on Plaintiff's claims.

For the reasons that follow, the motion will be granted in part and denied in part.

## I.     Background

On September 6, 2012, Defendant hired Plaintiff, an African-American woman, to be a part-time cashier in one of its Philadelphia, Pennsylvania stores. Defendant is a national retail store specializing in home improvement. Plaintiff worked for Defendant—first part-time, and then full-time—until her eventual termination on July 26, 2017.

### A.  Credit Coordinator Role

After working as a part-time cashier for several months, Plaintiff accepted a full-time role as a modified Credit/Special-Order-Sales ("SOS") Coordinator in April of 2013. The role was modified in that, although Defendant's corporate policies provided that the Credit/SOS

Coordinator role encompassed two responsibilities—managing credit services and following-up on special order sales—Plaintiff was responsible only for the former. Another employee worked part-time managing special order sales.

The Credit Coordinator role entailed greater responsibilities and increased pay. As the Credit Coordinator, Plaintiff was charged with training employees on Defendant's credit promotions by presenting credit information during morning meetings and keeping store employees informed of credit promotions. Although not required to do so, Plaintiff also choose to send out a semi-regular "Credit Newsletter" that contained credit-services-related information.

### B. The 2014 Incident

Sometime in early January of 2014,[1] the first incident relevant to this litigation took place ("the 2014 Incident"). Plaintiff claims that James Phillips—a white, male co-worker—cut in front of an African-American customer in line. According to Plaintiff, when confronted about it, Phillips said he did it because he is "white and privileged."

Plaintiff did not immediately report the incident to management. Instead, on January 15, 2014, Plaintiff again confronted Phillips about the line-cutting incident, telling him that she thought Phillips "was racist" and that it "was bred into him." Phillips reported the incident to Human Resources, which then investigated. Defendant took written statements from both parties as well as another employee who witnessed the January 15 exchange. During the investigation, Plaintiff reported the line-cutting incident to Defendant. Phillips denied making the remark, and Defendant could not identify any witnesses to the line-cutting incident to corroborate Plaintiff's account.

Ultimately, Defendant did not take disciplinary action against Phillips or Plaintiff based

---

[1] Plaintiff testified that she is unsure of the exact date.

on the 2014 Incident.  Instead, Juan Seguinot—the Human Resources manager of the store—reviewed the company's harassment policy with both Phillips and Plaintiff.

## C. The 2015 Incident

Seventeen months passed before the next event relevant to this litigation occurred ("the 2015 Incident").  On June 20, 2015, Plaintiff, Phillips, and another employee were engaged in a conversation about whether the South Carolina state flag was the Confederate flag.  After she commented that it would be "bad if that was the flag," Plaintiff claims that Phillips called her "retarded."  Neither Plaintiff nor Phillips immediately reported the exchange to management.  Four days later, however, the two had a related exchange online—Phillips referenced the conversation about the South Carolina flag in a Facebook post responding to a comment posted by Plaintiff.

Following the online exchange, Plaintiff filed a complaint with Human Resources on July 1, 2015.  Based on the complaint, Defendant investigated the exchange by taking written statements from Plaintiff, Phillips, and the other employee who witnessed the June 20 exchange.  Defendant also conducted in-person interviews with all three employees.  In his written statement, Phillips denied calling Plaintiff "retarded," and the other employee-witness stated that that he did not recall Phillips making the comment to Plaintiff.

On August 18, 2015, Defendant launched a broader investigation into both the 2014 and the 2015 Incidents.  On November 12, 2015, Defendant concluded that "no violations have been found to have occurred which would warrant further action," and informed Plaintiff via email that her concerns had been addressed.

## D. Change in Role

On July 4, 2015—three days after she submitted her complaint about Phillips—

Defendant changed Plaintiff's role as a Credit Coordinator from a full-time role to a part-time role. Plaintiff was also assigned a part-time role as a cashier. Megan Mitchell, who managed the store at the time, testified that the decision came "from corporate" and was aimed at bringing the "headcount" of the Credit/SOS Coordinator role into line with corporate guidelines. Karen Ortley, Defendant's Human Resources Manager for the region, testified that, over the last five years, approximately ten other Credit Coordinators had been transitioned from full-time to part-time roles in the region. Plaintiff's pay and benefits remained unchanged.

### E. Disciplinary Action

After the change in roles, Plaintiff began receiving feedback from management that her work as a Credit Coordinator was not up to par. Defendant maintains a progressive disciplinary policy, which provides that employee disciplinary action is to proceed along a set track from Initial Warning, to Written Warning, to Final Warning, to Termination. Seguinot testified that the disciplinary process resets after twelve months—that is, if an employee does not receive formal disciplinary action for twelve months, then the process begins anew at the Initial Warning stage. Seguinot further testified that he could not recall Defendant deviating from that procedure during his employment there.

On October 20, 2015, Defendant issued Plaintiff a Weekly Credit Gameplan that identified credit-related tasks for Plaintiff to complete on a weekly basis. Those tasks included: printing the previous week's credit reports, training associates on credit offers, sending out weekly credit summaries, completing observations of cashiers, promoting credit goals through a tracking sheet, and conducting weekly walkthroughs of the store.

On December 7, 2015, Defendant issued Plaintiff an Initial Warning for failing to complete the tasks outlined in the Weekly Credit Gameplan. The Initial Warning stated that

Plaintiff failed to train associates, complete observations, promote goals via a tracking sheet, and conduct walkthroughs. On March 4, 2016, Defendant issued Plaintiff a Written Warning for failing to achieve tasks "related to [Defendant's] credit program." The Written Warning stated that Plaintiff failed to train associates and was unprepared for morning meetings.

Following the Written Warning, Plaintiff continued to receive feedback from management about her performance as a Credit Coordinator. In particular, Juan Torres—the Assistant Store Manager responsible for supervising Plaintiff—continued to provide feedback about Plaintiff's failure to train five employees per week about credit services. However, Defendant took no additional, formal corrective action for the next fourteen months.

### F. Plaintiff's Family Medical Leave Act Requests

In 2016, Plaintiff began suffering from anxiety and depression. On May 12, 2016, Defendant approved Plaintiff's application for FMLA leave, allowing Plaintiff one absence per month for incapacity and two absences per month for doctor appointments. In late November of 2016, Defendant approved Plaintiff's recertification of FMLA leave, this time permitting two absences per month apiece for incapacity and doctor appointments. In May of 2017, Defendant again approved Plaintiff's FMLA certification, now allowing one absence per month for incapacity and two absences per month for doctor appointments. Between May 2016 and July 2017, Plaintiff utilized her FMLA leave, and, on at least two occasions, exceeded her allotment of leave.

### G. Final Warning & the 2017 Complaint

On May 29, 2017, Defendant issued Plaintiff a Final Warning. The Final Warning came over fourteen months after Plaintiff's last official disciplinary action. The Final Warning stated that:

[Plaintiff] exhibits an uncooperative and negative behavior to the execution in her job responsibilities as Credit Coordinator. During one on one meetings with management, [Plaintiff] has an uncooperative and usually argumentative approach to sharing weekly progress reports, planning, analyzing, and the execution of her responsibilities. On multiple occasions, when she's upset, she has been known to walk out of meetings without any notice to other participants. Within her newsletter, [Plaintiff] continues to post inappropriate statements and pictures despite receiving instructions from management to keep the content of her newsletter strictly to credit. During morning meetings, [Plaintiff] is repetitively tardy and unprepared to discuss current credit promotions and updates which usually has led her to share inaccurate information to salesfloor associates. These issues were previously discussed and expectations were set. This behavior is unacceptable and warrants disciplinary action for uncooperative behavior and poor job performance.

On June 6, 2017, a week after receiving her Final Warning, Plaintiff submitted a complaint of discrimination to Human Resources. Plaintiff complained that Torres and Mitchell were harassing her, unfairly "nitpicking" her work performance, retaliating against her for making complaints about another employee,[2] and retaliating against her for taking FMLA leave ("the 2017 Complaint"). Defendant investigated the complaint by meeting with Plaintiff, Torres, and Mitchell. Defendant determined that the claims were "unsubstantiated," and no further action was taken.

## H. Termination & Litigation

On July 26, 2017, Defendant terminated Plaintiff. The termination document stated:

[Plaintiff] continues to struggle with her responsibilities as the Credit Coordinator. Since her final [warning], [Plaintiff] continues to struggle with the execution of training employees on [Defendant's] credit programs, promotions, and topics. Within the last 30 days, [Plaintiff] has trained a total of 6 employees on [Defendant's] credit. [Plaintiff] also continues to share inaccurate credit information to employees during morning meetings and one on one sessions with management. [Plaintiff] continues to be unprepared to discuss current and weekly progress on credit, and struggles planning for current and future credit initiatives and/or events. [Plaintiff] continued to post non-credit related statements and pictures with her newsletter, despite receiving instructions to post credit related

---

[2] Defendant's documentation of Plaintiff's complaint withheld the employee's name. Plaintiff testified that the complaint concerned her 2015 complaint about Phillips. Defendant, on the other hand, contends that the complaint concerned an unrelated incident with another employee.

information only. These issues were previously discussed and expectations were set. This behavior continues to be unacceptable and has led to poor job performance.

On February 13, 2018, Plaintiff filed charges against Defendant with the Equal Opportunity Employment Commission ("EEOC"). On May 16, 2018, Plaintiff filed this action.

## II.    Legal Standard

Summary judgment must be granted to a moving party if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). Material facts are determined by reference to the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute "exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *U.S. ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 93 (3d Cir. 2018). While "all reasonable inferences" must be drawn in the non-moving party's favor, *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013), "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment," *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016).

## III.    Discussion

### A. Title VII and Section 1981

Both Title VII and Section 1981 proscribe race-based discrimination in the workplace. 42 U.S.C. § 2000e–2(a)(1) (providing that under Title VII "it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race"); *Jones v. R.R. Donnelley & Sons*

*Co.*, 541 U.S. 369, 373 (2004) (explaining that, as amended by the Civil Rights Act of 1991, Section 1981 provides a "statutory right 'to make and enforce contracts'" that protects against racially "harassing conduct that occur[s] after the formation of the contract").

In employment discrimination cases, the substantive protections afforded by Section 1981 and Title VII are co-extensive. *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017). Accordingly, both Section 1981 and Title VII claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework, which requires that:

> [A] plaintiff first must establish the requisite elements of his claim (called the *prima facie* elements); if so, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action, and then the plaintiff bears the burden of establishing that the employer's stated reason for the adverse action was an excuse, or pretext, for why the action was actually taken.

*Castleberry*, 863 F.3d at 263 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). Here, Plaintiff brings parallel claims for disparate treatment, retaliation, and hostile work environment under both Title VII and Section 1981. The Court will address each in turn, noting the difference between the statutory schemes only where relevant.

### 1. Disparate Treatment Claims

Plaintiff argues that three separate events support a disparate treatment claim: the 2014 Incident, the 2015 Incident, and the 2017 Complaint.

### a. Time-Barred Claims

Before moving to the merits, the Court must determine whether Plaintiff's disparate treatment claims are timely. "The limitations period for employment discrimination cases commences under both Section 1981 and Title VII when the plaintiff knows or reasonably should know that the discriminatory act has occurred." *Clark v. Sears, Roebuck & Co.*, 827 F. Supp. 1216, 1222 (E.D. Pa. 1993). So, "to determine the triggering of the statute, the proper

focus is on the time of the *discriminatory act* not the point at which the *consequence* of the act become painful." *Id.*

The limitations period for claims brought under Section 1981 and claims brought under Title VII differ. Disparate treatment claims brought under Section 1981—like those here—are subject to a four-year statute of limitations. *Jones*, 541 U.S. at 382. On the other hand, "to bring suit under Title VII, a claimant in . . . Pennsylvania[] must . . . file a complaint with the EEOC within 300 days of the alleged unlawful employment practice." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013). "[D]iscrete discriminatory acts"—like claims of disparate treatment—"are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Here, Plaintiff filed her EEOC complaint on February 13, 2018 and her legal complaint on May 16, 2018.[3] Accordingly, Plaintiff is barred from bringing Section 1981 claims for incidents that occurred prior to May 16, 2014 and Title VII claims for incidents that occurred prior to April 19, 2017. Applying those limitations periods to the facts here: Plaintiff is barred from bringing either a Section 1981 or a Title VII disparate treatment claim based on the 2014 Incident; Plaintiff's Section 1981 claim based on the 2015 Incident is timely; and, Plaintiff's Section 1981 and Title VII claims based on the 2017 Complaint are timely.

### b. Remaining Claims

Plaintiff's remaining disparate treatment claims must be analyzed under the *McDonnell Douglas* burden-shifting framework.

---

[3] On August 3, 2018, Plaintiff withdrew her initial complaint and filed an amended complaint, which is the complaint currently before this Court. Even if the timeliness of the Section 1981 claims is calculated from the date of the amended complaint, however, the results are the same.

### i.    *Prima Facie* Case

To make out a *prima facie* case of disparate treatment, Plaintiff must establish that she: (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and, (4) the circumstances of the adverse employment action imply discrimination. *Jones*, 198 F.3d at 410. The parties agree that Plaintiff satisfies the first two prongs: she is a member of a protected class and was qualified for the role of Credit Coordinator.

Plaintiff also satisfies the third prong because she suffered adverse employment actions following both the 2015 Incident and the 2017 Complaint. Two weeks after the 2015 Incident took place, Defendant changed Plaintiff's employment role. Although Plaintiff kept the same pay and benefits, she moved from performing her Credit Coordinator role full-time to performing these same duties part-time and performing the duties of a cashier part-time. *See Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994) ("[A] transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action."); *McGrenaghan v. St. Denis Sch.*, 979 F. Supp. 323, 326 (E.D. Pa. 1997) (same). Plaintiff was therefore required to perform the same functions in half the time, while also working in an arguably less desirable role as a cashier. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006). Thus, Plaintiff satisfies the third prong of the *prima facie* case as to the 2015 Incident; Plaintiff also satisfies that prong for the 2017 Complaint because she was fired shortly after filing her complaint.

Plaintiff's disparate treatment claims fail, however, because she has offered insufficient evidence to establish a genuine issue of material fact as to the causation element of the *prima facie* case for disparate treatment for either the 2015 Incident or the 2017 Complaint. The only evidence Plaintiff offers to establish an inference of discrimination is Phillip's comment that Plaintiff was "retarded," and Plaintiff's subjective belief that she was unfairly supervised and nit-

picked because of her race. That evidence, however, does not imply that Defendant acted with discriminatory animus.

First, Phillip's purported statement that Plaintiff was "retarded" is immaterial because, even if the statement evidences racial animus, "there is no apparent connection between the alleged remarks and the alleged adverse employment actions." *Byrd v. City of Philadelphia*, 2014 WL 5780825, at *5 (E.D. Pa. Nov. 6, 2014). Plaintiff advances no evidence linking Phillips' statement to any of the decisionmakers—Torres, Mitchell, Seguinot, or Ortley—who were responsible for the adverse employment action that is the basis of Plaintiff's disparate treatment claim. *Farzan v. Vanguard Grp., Inc.*, 582 F. App'x 105, 109 (3d Cir. 2014) (finding racially insensitive comments "immaterial because they were . . . not uttered by decisionmakers").

Second, Plaintiff's subjective belief that she was subject to harassment because of her race is, without more, insufficient to support an inference of racial discrimination. *Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.") (internal quotation marks omitted). Plaintiff offers no evidence to corroborate her claim that management engaged in racially-motivated harassment and "nit-picking."[4] *See Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 539 (7th Cir. 2007) (holding that employee's subjective belief that her workload was greater than other similarly situated employees was insufficient to establish disparate treatment).

---

[4] Plaintiff argues that Torres' deposition testimony in which he stated that, as Plaintiff's supervisor, he would supervise her work "once in a while," shows that she was unfairly nitpicked. That testimony—to the degree that it supports Plaintiff's claim at all—does not support the inference that Plaintiff suffered any adverse employment action "because of" her race. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) ("The 'central focus' of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.") (internal quotation marks omitted).

Finally, Plaintiff points to no comparator evidence of similar racial discrimination against any other employees working for Defendant. *Cf. Golod v. Bank of Am. Corp.*, 403 F. App'x. 699, 702 n. 2 (3d Cir. 2010) (noting that an inference of discrimination may be developed "in a number of ways, including, but not limited to, comparator evidence [or] evidence of similar racial discrimination of other employees"). Nor is there direct evidence of racially discriminatory animus on the part of Torres, Mitchell, Seguinot, or Ortley—Defendants' employees who were responsible for Plaintiff's adverse employment action. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) ("What is required is . . . direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision."); *Byrd*, 2014 WL 5780825, at *5 (same).

Because Plaintiff has failed to offer sufficient evidence from which a reasonable jury could conclude that the circumstances of Plaintiff's adverse employment actions imply discrimination, Defendant's motion for summary judgment will be granted on Plaintiff's Section 1981 and Title VII disparate treatment claims

### 2. Retaliation Claims

Plaintiff also brings claims under both Section 1981 and Title VII for retaliation, arguing Defendant impermissibly retaliated against her following the 2014 Incident, the 2015 Incident, and the 2017 Complaint.

### a. Time-Barred Claims

The aforementioned limitations period also apply to Plaintiff's retaliation claims. *See supra Part III.A.1.a; Morgan*, 536 U.S. at 113-14 (retaliatory acts are "discrete acts" each of which "starts a new clock for filing charges alleging that act"). Thus, Plaintiff is barred from bringing either a Section 1981 or a Title VII disparate treatment claim based on the 2014

Incident; Plaintiff's Section 1981 claim based on the 2015 Incident is timely; and, Plaintiff's

Section 1981 and Title VII claims based on the 2017 Complaint are timely.

### b. Remaining Claims

Retaliation claims brought under Section 1981 and Title VII are analyzed under the

*McDonnell Douglas* burden-shifting framework. *Woodson v. Scott Paper Co.*, 109 F.3d 913,

920 (3d Cir. 1997).

### i. *Prima Facie* Case

To make out a *prima facie* case of retaliation, Plaintiff must establish that: (1) she

engaged in a protected activity; (2) she suffered an adverse employment action; and, (3) there

was a causal link between her protected activity and the adverse employment action. *Daniels v.*

*Sch. Dist. of Philadelphia,* 776 F.3d 181, 193 (3d Cir. 2015).

### (1) Prong One – Protected Activity

"[T]he anti-retaliation provision of Title VII protects those who participate in certain

Title VII proceedings (the 'participation clause') and those who oppose discrimination made

unlawful by Title VII (the 'opposition clause')." *Moore v. City of Philadelphia*, 461 F.3d 331,

341 (3d Cir. 2006), *as amended* (Sept. 13, 2006). "Protected opposition activity includes not

only an employee's filing of formal charges of discrimination against an employer but also

informal protests of discriminatory employment practices, including making complaints to

management." *Daniels*, 776 F.3d at 193 (internal quotation marks omitted). "[The] complaint

must allege that her opposition was to discrimination based on a protected category, such as age

or race." *Id.* Complaints, however, "need not specify 'discrimination' or other 'magic words' to

qualify as protected activity." *Newell v. Heritage Senior Living, LLC*, 2016 WL 427371, at *7

(E.D. Pa. Feb. 3, 2016), *aff'd*, 673 F. App'x 227 (3d Cir. 2016); *see also Sitar v. Ind. Dep't of*

*Transp.*, 334 F.3d 720, 727 (7th Cir. 2003) (same). All that is required is evidence of "an objectively reasonable belief that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute." *Daniels*, 776 F.3d. at 194 (internal quotation marks omitted).

Plaintiff's complaint about the 2015 Incident constitutes protected activity under Section 1981 and Title VII. A reasonable factfinder could conclude that Plaintiff possessed a good faith and reasonable belief that her complaint about Phillip's comment alleged racial discrimination, even though the complaint did not use the magic words "racial discrimination." Plaintiff's complaint explains that Phillip's statement—calling her "retarded"—occurred within the context of a racially-charged conversation about the Confederate symbolism of the South Carolina state flag. Moreover, Plaintiff complained that the subsequent conversation via Facebook included Phillips making a "comment . . . based on race." Taken together and drawing all inferences in favor of the non-movant, the complaint evidenced Plaintiff's good faith, reasonable belief that Phillips's conduct constituted racial discrimination.

As for the 2017 Complaint, Plaintiff has raised a genuine issue of material fact as to whether she engaged in protected activity. In the 2017 Complaint, Plaintiff stated that Mitchell and Torres were retaliating against her for submitting a complaint about another employee that Mitchell and Torres knew for years. Although the documentation of the 2017 Complaint withheld the employee's name, Plaintiff testified that she was referring to the incidents with Phillips. On Plaintiff's account of events, then, the 2017 Complaint constitutes protected activity because a factfinder could find that Plaintiff possessed a good faith, reasonable belief that the activity complained of—Mitchell and Torres' retaliation against her for making a complaint of racial discrimination against Phillips—constituted unlawful discrimination under Title VII.

*Daniels*, 776 F.3d. at 194.[5]  Plaintiff therefore satisfies the first prong of the *prima facie*

retaliation claim as to the 2017 Complaint.

### (2) Prong Two – Adverse Action

Plaintiff satisfies the second prong because, as discussed above, she suffered adverse

employment actions following both the 2015 Incident and the 2017 Complaint—specifically, the

2015 change in role and her 2017 termination.

### (3) Prong Three – Causal Link

The third prong of a *prima facie* case is a "demonstrate[d] link between protected activity

and an employer's adverse action."  *Daniels*, 776 F.3d at 196.  A plaintiff asserting a claim of

retaliation must ultimately "prove that retaliatory animus had a 'determinative effect' on the

employer's decision to subject the employee to the adverse employment action."  *Carvalho-*

*Grevious v. Del. State Univ.*, 851 F.3d 249, 257-58 (3d Cir. 2017).  Courts consider "a broad

array of evidence in determining whether a sufficient causal link exists," including "temporal

proximity between the two if unusually suggestive . . . any intervening antagonism by the

employer, inconsistencies in the reasons the employer gives for its adverse action, and any other

evidence suggesting that the employer had a retaliatory animus when taking the adverse action."

*Daniels*, 776 F.3d at 196 (internal quotation marks omitted).  While timing alone may be enough

to establish the causation prong, *see Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989),

"timing plus other evidence may be an appropriate test where the temporal proximity is not so

close as to be 'unduly suggestive,'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d

Cir. 2000).

---

[5] As noted, Defendant contends that the 2017 Complaint concerns an altogether different incident, unrelated to
Phillips, and thus that the 2017 Complaint is not protected activity because Plaintiff did not complain of retaliatory
discrimination based on race.  Defendant's competing account, however, merely illustrates that a genuine issue of
material fact exists as to whether Plaintiff engaged in protected activity.

Plaintiff has offered sufficient evidence to satisfy the causation element for both the 2015 Incident and the 2017 Complaint. As for the 2015 Incident, the temporal proximity between Plaintiff's complaint and the adverse action is enough, on its own, to meet the causation prong. *Jalil*, 873 F.2d at 708 (reversing the grant of summary judgment in favor of the defendant because the plaintiff had established causation for the purposes of his *prima facie* case merely by showing that his discharge occurred only two days after his employer had received notice of his claim). Plaintiff submitted her complaint to Defendant concerning Phillips' comments on July 1, 2015. Three days later, Defendant changed Plaintiff's role from full-time to part-time, while also requiring that she perform cashier duties part-time. The close temporal proximity satisfies the causation prong. *Daniels*, 776 F.3d at 196.

As for the 2017 Complaint, the temporal proximity between Plaintiff's protected activity and the adverse action coupled with Defendant's deviation from its progressive disciplinary poolicy satisfies the causal prong. On May 29, 2017, Defendant issued Plaintiff a Final Warning without complying with its internal, progressive disciplinary policy, as fourteen months had transpired since Plaintiff's last official disciplinary action. Seguinot testified that Defendant's policy provided that disciplinary action expired after twelve months, but that Defendant did not follow that guideline in issuing Plaintiff her Final Warning. Six weeks after issuing the Final Warning, Defendant terminated Plaintiff's employment. The temporal proximity between the 2017 Complaint and Plaintiff's termination plus Defendant's departure from its progressive disciplinary policy satisfies the causal prong of the *prima facie* retaliation claim.

### ii. Legitimate Nondiscriminatory Reason

Because Plaintiff has made out a *prima facie* case of retaliation, the "burden . . . shift[s]

to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Castleberry*, 863 F.3d at 263. Defendant has met that burden.

With regards to the 2015 decision to change Plaintiff's role, Mitchell testified that the decision came "from corporate" and was aimed at bringing "headcount" in line with corporate guidelines. Ortley testified that other Credit Coordinators in the region were also moved from from full-time to part-time roles.

As to Plaintiff's eventual discharge, Defendant offered evidence that Plaintiff was terminated for failing to meet the requirements of her job. Defendant produced evidence that Plaintiff failed to train employees on credit policies, provided inconsistent or incorrect information about credit policies, and came to meetings unprepared with credit information.

### iii. Pretext Analysis

The burden now shifts back to Plaintiff to demonstrate that Defendant's proffered reasons are pretextual. To do so, Plaintiff must "demonstrate 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' from which a reasonable juror could conclude that the Defendants' explanation is 'unworthy of credence, and hence infer that the employer did not act for the asserted [non-retaliatory] reasons.'" *Carvalho-Grevious*, 851 F.3d at 262 (quoting *Daniels*, 776 F.3d at 199). The Court "rel[ies] largely on the evidence produced in support of [Plaintiff's] prima facie case," as "nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Id*. (internal quotation marks omitted).

### (1) The 2015 Incident

To prevail at trial, Plaintiff need not convince the factfinder that, had she not filed her complaint about the 2015 Incident, Defendant never would have changed her work status; rather, she only needs to convince the factfinder that, but for filing the complaint, Defendant would not

have moved her to part-time on July 4, 2015. *See Carvalho-Grevious*, 851 F.3d at 262. Prior to the change in her role, the evidence indicates Plaintiff worked full-time as a Credit Coordinator without incident. Defendant points to nothing in the record indicating that Plaintiff failed to fulfill the responsibilities of the role during that time. All the evidence Defendant offers in support of its position that Plaintiff failed to meet the requirements of the role comes from after the 2015 Incident. Nevertheless, three days after submitting a complaint alleging an incident of racial discrimination, Defendant changed Plaintiff's role, requiring her to perform the same duties in half the time, while also working in the less desirable role as a cashier. This evidence "raise[s] a factual issue regarding the employer's true motivation" for revising her role, "and as such, her claim against [Defendant] withstand[s] summary judgment." *Id.* (internal quotation marks omitted).

### (2) The 2017 Complaint

Plaintiff has presented sufficient evidence from which a reasonable fact finder could conclude that had Plaintiff not filed the 2017 Complaint, Defendant would not have terminated her when it did. On May 29, 2017, Defendant issued Plaintiff a Final Warning, even though the Final Warning came over fourteen months after the last official disciplinary action, and even though Defendant's disciplinary policy provides that disciplinary actions typically expire after twelve months. As Seguinot testified, he could not recall an instance where Defendant deviated from its procedure in that manner during his employment there. A week after receiving her Final Warning, Plaintiff filed her 2017 Complaint, alleging Torres and Mitchell retaliated against her for filing a complaint of racial discrimination. Six weeks later, Plaintiff was terminated. The temporal proximity between Plaintiff's complaint and her termination coupled with Defendant's failure to comply with its own, internal policies in disciplining Plaintiff "raise[s] a factual issue

regarding the employer's true motivation" for the termination. *Id.* Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliation claim will be denied as to the 2017 Complaint.

### 3. Hostile Work Environment Claims

Plaintiff also brings claims for hostile work environment under Section 1981 and Title VII. "Hostile environment claims are different in kind from discrete acts," *Morgan*, 536 U.S. at 115, and thus not subject to the *McDonnell Douglas* burden shifting framework.[6] Instead, to prevail on a hostile work environment claim, Plaintiff must show she was subjected to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.* 510 U.S. 12, 21 (1993). "Whether an environment is hostile requires looking at the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Castleberry*, 863 F.3d at 264 (holding that even an isolated incident may be sufficient to state a claim under the standard).

Here, Plaintiff brings two, separate hostile work environment claims: retaliatory hostile work environment and hostile work environment based on race.

### a. Retaliatory Hostile Work Environment

To establish a retaliatory hostile work environment claim, Plaintiff must show that: (1) she suffered intentional discrimination because of her protected activity; (2) the discrimination

---

[6] Hostile work environment claims also differ from discrete act claims in that a hostile work environment claim may be premised on occurrences that fall outside the limitations period, if the plaintiff can show that a continuing violation existed. *Morgan*, 536 U.S. at 117.

was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled on other grounds by Burlington*, 548 U.S. at 67.

Plaintiff's claim fails on the second prong. The only evidence Plaintiff offers to establish that she suffered severe or pervasive discrimination is that she was subject to adverse employment actions after engaging in protected activity—that is, she relies on the same set of facts upon which her retaliation claims are based. On its own, however, that evidence falls short of what is required to establish a hostile work environment. *See, e.g.*, *Walden v. Patient-Centered Outcomes Research Inst.*, 177 F. Supp.3d 336, 345 (D.D.C. 2016) (upholding a retaliation claim but finding the same set of facts insufficient for a retaliatory hostile work environment claim). Indeed, if a successful retaliation claim was sufficient, on its own, to make out a claim for retaliatory hostile work environment, then the causes of actions would collapse into one, a result that is countermanded by the Supreme Court's instruction that hostile work environment claims are "different in kind from discrete acts" of retaliation. *Morgan*, 536 U.S. at 115; *Petrulio v. Teleflex Inc.*, 2014 WL 5697309, at *10 (E.D. Pa. Nov. 5, 2014) ("A retaliatory hostile work environment claim is analytically distinct from a retaliation claim").

Plaintiff, however, offers no additional evidence from which a reasonable factfinder could conclude that she suffered severe or pervasive retaliatory discrimination. There is no evidence, for example, that Plaintiff was subject to "physically threatening or humiliating" conduct. *Morgan*, 536 U.S. at 115 (finding combined effect of insults, physical threats, and vandalism to personal property gave rise to an inference of severe or pervasive discrimination). Nor has Plaintiff established that she was subject to the type of "discriminatory intimidation,

ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's working environment." *Harris*, 510 U.S. at 21. Although Plaintiff alleges that Torres and Mitchell harassed her for filing a complaint against Phillips, there is no evidence in the record that the management team engaged in sever or pervasive harassment of Plaintiff—there is no evidence, for example, that Torres and Mitchel nitpicked or micromanaged Plaintiff. Plaintiff's subjective belief that she was subject to harassing conduct is insufficient to withstand a motion for summary judgment. *Podobnik,* 409 F.3d at 594.

Because Plaintiff has failed to offer evidence of "severe or pervasive discrimination" beyond the adverse employment action, Plaintiff's claim for retaliatory hostile work environment must fail.

### b. Hostile Work Environment Based on Race

Plaintiff also brings a claim for hostile work environment based on race, which requires Plaintiff to establish that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) the existence of *respondeat superior* liability. *Castleberry*, 863 F.3d at 264.

Plaintiff's claim again fails on the severe or pervasive prong. "[O]ffhand comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Here, the only evidence Plaintiff proffers of severe or pervasive racial discrimination is Phillips comments during the 2014 and 2015 Incidents—specifically, Phillips' statement that he cut in front of a customer in line because he is "white and privileged" and his statement calling Plaintiff "retarded." The two comments, which came seventeen months apart and at least three years

before her eventual termination, were neither sufficiently pervasive nor severe to satisfy the second prong of a hostile work environment claim. *See, e.g.*, *Grossberg v. Hudson Cty. Dep't of Human Servs.*, 740 F. App'x 762, 766 (3d Cir. 2018) (finding several incidents over the course of one year not sufficiently "sever or pervasive" conduct to make out a hostile work environment claim); *Sessoms v. Trustees of Univ. of Pennsylvania*, 739 F. App'x 84, 90 (3d Cir. 2018) (holding that one-off incident, "while inappropriate and unwelcome, was not so egregious as to amount to 'a change in the terms and conditions of employment'") (quoting *Castleberry*, 863 F.3d at 264).

Defendant will therefore be granted summary judgment on Plaintiff's hostile work environment claim based on race.

### B. Americans with Disabilities Act Claims

Plaintiff also brings claims under the ADA, alleging Defendant discriminated against her based on a disability, and retaliated against her for engaging in protected activity. Plaintiff's ADA claims, like her Title VII claims, are analyzed using the *McDonnell Douglas* burden-shifting framework. *Williams*, 380 F.3d at 759.

#### 1. Discrimination Claim

Plaintiff claims that she was unlawfully terminated because of her disability. To make out a *prima facie* case of disability discrimination, Plaintiff must show: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and, (3) she has suffered an otherwise adverse employment decision as a result of discrimination. *Id.* at 761 (internal quotation marks omitted).

Plaintiff's claim fails on the causation prong. "The element of causation, which

necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997). While "timing and ongoing antagonism" are often "the basis for [finding a] causal link," a plaintiff may establish "a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Farrell*, 206 F.3d at 281-82. Nevertheless, to withstand summary judgment, a plaintiff must point to some evidence from which a reasonable fact finder could conclude that "intentional discrimination was the *but for* cause of allegedly discriminatory action." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 (3d Cir. 2007).

Plaintiff has not offered evidence from which a reasonable fact finder could conclude that intentional discrimination was the "but for cause" of her termination. The temporal proximity between her termination and request for leave—a little over two months—is not on its own "unduly suggestive." *Williams*, 380 F.3d at 760. Nor is there evidence of "ongoing antagonism" from Defendant regarding Plaintiff's use of an accommodation. In fact, the evidence suggests just the opposite: Defendant granted Plaintiff leave to treat her anxiety in May 2016, October 2016, and May 2017. Thus, summary judgment will be granted to Defendant on Plaintiff's disability discrimination claim.

### 2. Retaliation Claim

Plaintiff's ADA retaliation claim falls for the same reason. To make out a *prima facie* case of retaliation under the ADA, Plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

Again, Plaintiff fails to introduce evidence from which a reasonable factfinder could

conclude that a causal connection exists between her termination and her request for an accommodation.  As noted, over two months passed between Plaintiff's last request for an accommodation and her firing—a period that is not "unduly suggestive."  *Williams*, 380 at 760. Nor is there any evidence of "ongoing antagonism" over the use of the accommodation: Plaintiff took leave without issue for over a year before her termination.

### C.  Family and Medical Leave Act Claims

Finally, Plaintiff claims Defendant violated the FMLA by interfering with her use of FMLA leave and retaliating against her for using leave.  Courts assess FMLA claims through the *McDonnell Douglas* burden-shifting framework.  *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 151 (3d Cir. 2017).

#### 1.  Interference Claim

To make out a *prima facie* case for interference under the FMLA, Plaintiff must show: (1) she was an eligible employee under the FMLA; (2) Defendant was an employer subject to the FMLA's requirements; (3) she was entitled to FMLA leave; (4) she gave notice to Defendant of her intention to take FMLA leave; and (5) she was denied benefits to which she was entitled under the FMLA.  *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014).

Plaintiff's FMLA claim fails because she was not denied benefits to which she was entitled—the fifth prong of the *prima facie* case.  FMLA regulations provide that interference "includes . . . discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).  The Supreme Court has explained, however, that the FMLA "provides no relief unless the employee has been prejudiced by the violation."  *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).  In *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231 (3d Cir. 2016), the Third Circuit held that a defendant did not violate the FMLA where it threatened disciplinary

action against a plaintiff for taking approved leave time because such reprimands did not "occur in tandem with actual harm." *Id.* at 245-46. The defendant's threats and reprimands did not sufficiently "chill[] the assertion of [plaintiff's] FMLA rights" to support a claim of interference because the plaintiff was not "actually denied FMLA leave." *Id*. at 246.

Here, Plaintiff offers no evidence that she was "actually denied FMLA leave." *Id*. Plaintiff avers that she felt pressured by Defendant to forgo leave because Defendant scheduled her to work on certain days. But, Plaintiff testified that Defendant never told her that she could not use FMLA leave. In addition, Plaintiff could not identify a specific time where Defendant's conduct prevented her from taking leave. Absent a showing of interference "occur[ing] in tandem with actual harm," Plaintiff has failed to make out a claim for FMLA interreference.

### 2. Retaliation Claim

The FMLA also prohibits an employer from "discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). To make out a *prima facie* case of FMLA retaliation, Plaintiff must establish: (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).

Plaintiff's claim fails, again, on the causation prong. As Plaintiff concedes, her FMLA retaliation claim is identical to her ADA retaliation claim. And, as discussed above, Plaintiff has failed to introduce evidence establishing a causal connection between her termination and her request for leave. Over two months passed between Plaintiff's last request for leave and her firing—a period that is not "unduly suggestive." *Williams*, 380 at 760. Nor is there any evidence of "ongoing antagonism" over the use of leave because Plaintiff took leave without

issue for over a year before her termination.  Plaintiff has failed to introduce evidence to satisfy the casual prong of her FMLA retaliation claim.

In conclusion, Plaintiff's Section 1981 retaliation claim based on the 2015 Incident and her Section 1981 and Tittle VII retaliation claims based on the 2017 Complaint withstand Defendant's summary judgment motion.  The remainder of Plaintiff's claims do not, and Defendant will therefore be granted summary judgment as to those claims.

An appropriate order follows.

**March 4, 2019**                                      **BY THE COURT:**

                                                       **/s/Wendy Beetlestone, J.**

                                                       _____

                                                       **WENDY BEETLESTONE, J.**